SECOND DIVISION

No. 1-08-0621

| | | |
|---|---|---|
| *In re* L.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Brenda H., | ) | Honorable |
| | ) | Mary Lane Mikva, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Respondent Brenda H. appeals from an order of the circuit court finding respondent's minor daughter, L.H., to be a neglected minor pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-3(1)(a) (West 2006)). The court found respondent neglected L.H. by refusing to allow L.H. to return home after a hospitalization and refusing to participate in treatments or services to aid L.H. The court made L.H. a ward of the court and assigned the Department of Children and Family Services (DCFS) as her guardian. Respondent argues the court's finding of neglect was against the manifest weight of the evidence. We affirm.

Background

L.H. was born in October 1991. Respondent adopted her in May 2000. On January 23, 2007, when L.H. was 15 years old, she was admitted to Hartgrove Hospital for a medical and psychiatric assessment after she ran away from home. She was diagnosed with bipolar disorder, with severely disorganized thought patterns resulting in poor judgment. On March 1, 2007, the State filed a petition for adjudication of wardship regarding L.H., alleging she was neglected due to lack of necessary care by respondent because respondent refused to pick L.H. up from the hospital, to cooperate with postadoptive services and to create an alternate care plan for L.H. On March 14, 2007, the court held a hearing on the petition. Respondent stipulated to the allegations in the petition and the court found probable cause to believe L.H. was neglected. It granted DCFS temporary custody of L.H. Respondent informed the court she did not want any visits with L.H. She subsequently informed the court that she wished to consent to surrender of her parental rights but the court refused to accept her consent given that it was not in L.H.'s best interests to do so.

Respondent filed assorted supplemental petitions for adjudication of wardship alleging L.H. was dependent and in need of authoritative intervention pursuant to section 2-4(1)(c) of the Act (705 ILCS 405/2-4(1)(c) (West 2006)) because, through no fault of her parent, she was without proper medical, remedial or other care necessary for her well-being. Respondent asserted it was in L.H.'s best interests to be declared dependent pursuant to section 2-4(1)(d) of the Act (705 ILCS 405/2-4(1)(d) (West 2006)) because respondent wished to be relieved of her parental rights and

2

responsibilities toward L.H. so that L.H. could receive the care she needed.

The court held an adjudicatory hearing on December 11, 2007. DCFS child protection investigator Karen Roberts Dixon testified she was assigned to L.H.'s case on January 23, 2007, when DCFS received a hotline call that L.H. had left home and had scratches on her neck and body allegedly inflicted by respondent. She went to respondent's home in Orland Park and interviewed her about L.H.'s allegations. Respondent told her she did not want L.H. to return home from the hospital. Respondent told Dixon DCFS had not given respondent accurate information about L.H. when she adopted her; something was wrong with L.H.; L.H. "steals all the time" and "was an embarrassment to her family;" and respondent did not want L.H. back in her home.

Dixon testified DCFS received another hotline call about L.H. on February 6, 2007, when respondent refused to pick up L.H. at the hospital when she was ready for discharge. Respondent informed Dixon she was not going to pick up L.H. Dixon held a meeting with respondent and assorted clinical, adoption and social workers to discuss L.H.'s discharge and the services available to respondent once L.H. returned home. Respondent stated L.H. could not return home and was not receptive to the postadoptive services offered by Dixon and the other staffers. Respondent was informed she had the responsibility to find an alternative placement for L.H. if L.H. could not return home. She failed to do so. Instead, she faxed Dixon 20 letters from respondent's relatives stating they were not able to care for L.H. Dixon found

3

respondent unreceptive to L.H. coming home and uncooperative with DCFS.

In addition to the January 2007 episode, L.H. had been suspended from school and received community service for stealing a purse at school a few weeks prior to her hospital admission, allegedly stolen money from one of her brothers, made prior allegations of abuse against respondent which proved unfounded and had run away for a short time two years previously. A psychological evaluation showed L.H. to be preoccupied with anger and depression directed at respondent as a result of respondent's refusal to allow L.H. to return home and that L.H. felt abandoned.

Orland Park police officer Henry Scholnveld testified that, at approximately 8 p.m. on January 22, 2007, he and two other officers responded to a call from respondent that L.H. had left home without clothes on. By the time he arrived at respondent's home, L.H. had returned and was clothed. Respondent told the officers she had originally called because L.H. had stolen money and she did not want L.H. at the house any more. Respondent asked whether the officers could "take [L.H. away]." The officers suggested a counselor come and try to resolve the situation. To that end, they transported respondent and L.H. to the police station where they met with a counselor. On the way to the station, Officer Scholnveld talked with L.H. She told him she was acting out because she wanted to see her biological mother and siblings. L.H. did not tell Officer Scholnveld respondent hit her and he saw no signs of abuse on her.

Respondent testified that she adopted L.H. in May 2000. She has three biological children and two other adopted children. Respondent stated her problems

with L.H. began shortly after the adoption. She said L.H. stole from everyone who came to respondent's home and from her school teachers and fellow students. L.H. was reported to the police and suspended for stealing from a teacher in November 2006. Orland Park police first called respondent about L.H. stealing when L.H. was 13. They next called her because L.H. alleged respondent hit L.H. in the eye with a hammer. An investigation proved the allegation was unfounded.

Respondent testified she took L.H. to church every week. Starting in 2002, she had her pastor and his wife counsel L.H. in order to find out what was wrong with her. Respondent thought something was wrong with L.H. because of her stealing behavior. Respondent also had her sister and adult children counsel L.H. She never had any problems with her children in school except with L.H. Her three biological children graduated as high school valedictorians; one became a surgical nurse and another was an National Football League player. Her two adoptive sons were on the honor rolls at their respective schools. L.H. had her own room and was given an allowance of $20 every two weeks.

Respondent stated she was taking care of her handicapped mother and L.H. poured bleach into respondent's mother's milk, telling respondent she was tired of cleaning up after old people. Respondent's son saw L.H. pour in the bleach. Respondent threw the milk away before her mother drank it.

When L.H. ran out of the house nude on January 22, 2007, it was snowing. One of respondent's sons brought her back. She had run away once before in 2005, at

which time a counselor came to the house to help counsel her at the behest of the Orland Park police department. Respondent could not remember how often the counselor came or the counselor's name. Respondent stated she called DCFS for help with L.H. several times in 2004 or 2005, only to be told she was responsible for L.H. She did not know what help DCFS had available. She made no other attempts to get help for L.H. through DCFS.

On December 14, 2007, after closing arguments, the court entered an adjudication order finding L.H. neglected due to lack of care pursuant to section 2-3(1)(a) of the Juvenile Court Act because respondent refused to let L.H. return home after hospitalization or to be involved in her treatment. It found the evidence did not support respondent's allegation of dependency. The court stated it was clear L.H. did not have the care she needed and the State met its burden to show this was neglect. The court noted that there is no difference between the way an adoptive parent and a biological parent must provide necessary care and, although L.H. "was a really tough kid," that did not mean respondent did not have a responsibility to address her needs. The court found respondent not credible on her assertion that L.H. put bleach in her grandmother's milk and "on several other points." It found no evidence that L.H. was physically violent toward respondent or her family and, beyond the fact that respondent found L.H.'s running away and thieving embarrassing, L.H. presented no danger to the family. It found respondent incredible regarding her efforts to help L.H. and her pastor's involvement. It found respondent did not visit L.H. at the hospital, had made no

6

previous attempts at hospitalization, engaged in little professional counseling and was so uninvolved in the aborted attempt at counseling that she did not recall the counselor's name.

On February 1, 2008, the court held a dispositional hearing as well as a permanency hearing. It heard testimony from Chancey Ross, the DCFS case worker who originally facilitated L.H.'s adoption and was reassigned to L.H.'s case in March 2007. Ross informed the court that L.H. had been in two placements since leaving respondent's home but was currently in a shelter. L.H. had not wanted to live at the first placement with her maternal biological grandmother and ran away from the second placement in a foster home. She disappeared for 21 days. Ross stated respondent had not made herself available to be assessed for services; had never contacted Ross or DCFS for services; had never inquired about having L.H. return home; had never visited L.H.; had L.H.'s gym shoes returned to her when L.H. was hospitalized, leaving her only a dress and jacket; and, in May 2007, told Ross she did not want to be involved in L.H.'s case, did not want to talk to DCFS and did not want DCFS to visit her home regarding L.H.

The court found that respondent was unable and unwilling to parent L.H. but declined to find her unfit. It stated it was respondent's responsibility to care for L.H., to try to address her needs and work with the agency to address those needs, regardless of what L.H. might want. It terminated temporary custody, made L.H. a ward of the court and placed DCFS as her guardian with the right to place her. The court set

7

"return home" as the goal. Respondent informed the court that she wanted to relinquish her parental rights. DCFS objected and the court refused to accept her consents to relinquishment of her rights.

On February 29, 2008, respondent filed a *pro se* notice of appeal from the court's December 14, 2007, "[f]inding after an adjudication hearing of abuse for lack of care" and February 1, 2008, "[d]ispositional findings of unable & unwilling."

Analysis

Respondent's sole argument on appeal is that the court's finding of neglect is against the manifest weight of the evidence and the case should be remanded for a finding that L.H. is a dependent minor in need of authoritative intervention. The State has the burden to prove allegations of neglect or dependency by a preponderance of the evidence. *In re Christina M.*, 333 Ill. App. 3d 1030, 1034, 777 N.E.2d 655, 658 (2002); *In re Christopher S.*, 364 Ill. App. 3d 76, 88, 845 N.E.2d 830, 839 (2006). On review, we will not reverse a court's finding of neglect or dependency unless the finding is against the manifest weight of the evidence, *i.e.*, the opposite conclusion is clearly evident from the record. *In re Christina M.*, 333 Ill. App. 3d at 1034, 777 N.E.2d at 658; *In re Christopher S.*, 364 Ill. App. 3d at 86, 845 N.E.2d at 839-40.

Pursuant to the Act, a "neglected minor" is a child "under 18 years of age who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and

shelter, or who is abandoned by his or her parents."  705 ILCS 405/2-3(1)(a) (West 2006); *In re Christopher S.*, 364 Ill. App. 3d at 88, 845 N.E.2d at 840.  "Neglect" is generally defined as the failure to exercise the care that circumstances justly demand and includes both unintentional and willful disregard of parental duties.  *In re Christopher S.*, 364 Ill. App. 3d at 88, 845 N.E.2d at 840; *In re Christina M.*, 333 Ill. App. 3d at 1034, 777 N.E.2d at 659.  Because "neglect" has no " 'fixed and measured meaning,' " it takes its content from the specific circumstances of each case.  *In re Christopher S.*, 364 Ill. App. 3d at 88, 845 N.E.2d at 840, quoting *In re Christina M.*, 333 Ill. App. 3d at 1034, 777 N.E.2d at 659.  Any case involving an adjudication of neglect and wardship must, therefore, be decided on the basis of its own unique circumstances.  *In re Christopher S.*, 364 Ill. App. 3d at 88, 845 N.E.2d at 840; *In re Christina M.*, 333 Ill. App. 3d at 1034, 777 N.E.2d at 659.  The court's finding that L.H. was a neglected minor is not against the manifest weight of the evidence.

The evidence shows respondent willfully refused to provide for or assist L.H. after her discharge from the hospital.  Respondent refused to let L.H. return home after her hospitalization, refused to cooperate with DCFS, ordered DCFS not to contact her with regard to L.H. and informed DCFS she wanted nothing more to do with L.H.  As the court noted, L.H. may be a tough child to handle but she is still respondent's child, adopted or not, and it is respondent's responsibility to do everything she can to care for L.H. and provide for her well-being.  Respondent willfully failed to do so.  Granted, respondent fed, clothed, housed and provided an allowance to L.H. for seven years and

took her to church every week. But when things got difficult, respondent did not provide the care L.H. needed. She refused to allow L.H. to return home and cut off all contact with her, refusing to visit her at the hospital, to call her or to let her adoptive brothers contact her.

Despite respondent's assertion that L.H. was a problem from the time respondent adopted her, respondent never sought help for L.H. or herself beyond asking a few of her relatives and her pastor and his wife to counsel L.H. Respondent did not pursue postadoption support from DCFS, did not continue the counseling instigated by the Orland Park police department, did not participate in any of the programs or services offered by DCFS during and after L.H.'s hospitalization and did not seek alternate placement arrangements for L.H. Instead, respondent abandoned L.H. for no reason other than L.H. was an embarrassment to respondent and her family. As the court found, where, as here, there is no evidence that L.H. was violent or a danger toward respondent or other family members, respondent's response to L.H.'s misbehavior constituted neglect.

The evidence does not support respondent's assertion that L.H. is a dependent minor requiring authoritative intervention. The Act defines a "dependent minor" as a child "under 18 years of age *** who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being through no fault, neglect, or lack of concern by his parents." 705 ILCS 405/2-4(1)(c) (West 2004); *In re Christopher S.*, 364 Ill. App. 3d at 86, 845 N.E.2d at 839. Respondent affirmatively

locked L.H. out of her home against the advice of the hospital and DCFS, refused to cooperate with DCFS in developing a care plan for L.H., refused to provide alternate placement for L.H. and refused to consider L.H.'s return to her home. Clearly, respondent is responsible for placing L.H. in her current position, and the evidence supports classifying L.H. as neglected rather than dependent. See *In re Christina M.*, 333 Ill. App. 3d at 1035-36, 777 N.E.2d at 659-60.

Moreover, L.H. does not meet the definition of a minor requiring authoritative intervention, which the Act defines as

> "any minor under 18 years of age (1) who is (a) absent from home without consent of parent, guardian or custodian, or (b) beyond the control of his or her parent, guardian or custodian, in circumstances which constitute a substantial or immediate danger to the minor's physical safety; and (2) who, after being taken into limited custody for the period provided for in this Section and offered interim crisis intervention services, where available, refuses to return home after the minor and his or her parent, guardian or custodian cannot agree to an arrangement for an alternative voluntary residential placement or to the continuation of such placement." 705 ILCS 405/3-3 (West 2006).

L.H. is absent from home because respondent does not want her at home, has acted affirmatively to keep her from home and essentially given her consent to be absent from home. There is no evidence L.H. was beyond respondent's control and was an immediate or substantial danger to herself, only that she was an embarrassment. The

11

fact that L.H. is in the State's care is entirely due to respondent's desire to be rid of her. The court did not err in finding the evidence does not support a finding that L.H. is a dependent minor in need of authoritative intervention. We affirm the court's finding L.H. a neglected minor due to respondent's lack of care.

Although respondent filed a notice of appeal from the court's "[d]ispositional findings of unable & unwilling," she does not make any argument contesting these findings on appeal and has, therefore, waived this issue. 210 Ill.2d R. 341(h)(7); *People v. Wendt*, 163 Ill.2d 346, 351, 645 N.E.2d 179, 181 (1994) (points not raised or argued in an opening appellate brief are waived).

For the reasons set forth above, we affirm the decision of the circuit court.

Affirmed.

SOUTH and HALL, J.J., concur.

1-08-0621

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

*In re* L.H., a Minor

(The People of the State of Illinois

      Petitioner-Appellee,

v.

Brenda H.,

      Respondent-Appellant).

No. 1-08-0621

Appellate Court of Illinois
First District, Second Division

August 26, 2008

JUSTICE KARNEZIS delivered the opinion of the court.

SOUTH and HALL, JJ., concur.

Appeal from the Circuit Court of Cook County.

The Honorable Mary Lane Mikva, Judge Presiding.

For APPELLANT: Edwin Burnette, Public Defender of Cook County (Denise R. Avant, of counsel)

For APPELLEE - MINOR: Office of the Cook County Public Guardian (Robert F. Harris, Kass A. Plain and Michelle V. Hamilton, of counsel)

1-08-0621

For APPELLEE - STATE OF ILLINOIS: Richard A. Devine, State's Attorney, County of Cook (Assistant State's Attorneys James Fitzgerald, Nancy Kisicki and Grace E. Zaya, of counsel)