# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re J.S.*, 2012 IL App (1st) 120615

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.S., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. A.Y., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-0615 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | July 31, 2012<br><br>August 24, 2012<br>September 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Based on the record showing that respondent minor had been locked out of his home and had been placed in shelters and other facilities and with relatives, but he still suffered from the same emotional and behavioral problems and his mother failed to develop a care plan for him, the trial court's finding that the minor was neglected was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-JA-0409; the Hon. Maxwell Griffin, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

E. Madeline O'Neill, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Graver Kisicki, and Nicole I. Lucero, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and John David Jarrett, of counsel), guardian *ad litem*.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.

Justices Fitzgerald Smith and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1     Following an adjudication hearing, the trial court found J.S. to be a neglected minor, due to lack of care, pursuant to section 2-3 of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-3 (West 2010)) and, after a dispositional hearing, made J.S. a ward of the court. Mother-respondent A.Y. (hereinafter, respondent) appeals the trial court's finding that J.S. was neglected. We affirm.

¶ 2                              BACKGROUND

¶ 3     As an initial matter, we note and concur with the trial court's comment, which described the trial court record as "sketchy" and confusing. Nonetheless, we will review respondent's claim with the record before this court.

¶ 4     The minor J.S., born August 20, 1996, is the son of respondent and J.S. Sr. is not a party to this appeal. On May 31, 2011, respondent dropped J.S. off in the parking lot of a Harvey police station and was unwilling to allow him to return home. On June 15, 2011, the State took temporary custody of J.S. and filed a petition for adjudication of wardship, alleging that J.S. was abused due to lack of care pursuant to section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2010)), neglected due to an injurious environment pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2010)), and neglected due to substantial risk of injury pursuant to section 2-3(2)(ii) of the Act (705 ILCS 405/2-3(2)(ii) (West 2010)). In support of all counts, the petition stated that on June 1, 2011, mother refused, and to date refuses, to allow the minor to return home. Further, respondent had refused to create a care plan for J.S. and refused the family preservation services offered by the Illinois Department of Children and Family Services (DCFS).

¶ 5        At the adjudicatory hearing, which commenced on October 24, 2011, and was continued five times until its conclusion on January 20, 2012, Robert Holman, a Thornton Township Youth Committee (TTYC) crisis worker, testified on behalf of the State. In his capacity as a crisis worker, Holman assists families, police and DCFS with issues involving minors, *i.e.*, cases of "lockouts" or runaways. A lockout is when a parent removes a child from the home, locks the door and does not allow the child back into the home.

¶ 6        J.S. first came to Holman's attention in April 2010 after DCFS and the Harvey police department telephoned his agency to report that J.S. had been locked out of his home. During the initial meeting, Holman, in order to facilitate a reunion, inquired as to what events led up to the lockout of J.S. Following the meeting, J.S. was transferred to Ingalls Hospital, where a psychological evaluation was performed. He was then transferred to Chicago Lake Shore Hospital and ultimately reunited with his mother.

¶ 7        Holman's next contact with J.S. was in May 2012. Similar to their initial meeting, Holman was contacted by a superior that informed him that a child had been locked out of his home and was at the Harvey police station. At this meeting, Holman again inquired as to what events had occurred that led him to being locked out of his home. Holman then tried to contact respondent on her cellular telephone. When she did not answer, Holman left a voicemail identifying himself and the reason for his call. After two further unanswered attempts, Holman then began finding alternative housing arrangements for J.S., eventually placing him at the Teen Living Program Bronzeville Youth Shelter. Holman then went to respondent's home, but was unable to speak with respondent. Holman left his contact information and also left word regarding J.S.'s location.

¶ 8        Respondent telephoned Holman the day after he was at her home. Holman inquired as to whether she would allow J.S. to return home. She answered no. Holman next requested that respondent prepare clothing, medication and other necessities for J.S. if he was going to have to stay at the Bronzeville Youth Shelter. Despite Holman's urging, respondent refused to drop off the clothing with her son but rather had Holman pick the clothing up from her home and drop it off at the shelter. Finally, Holman inquired as to when J.S. was going to be allowed to come home. Respondent stated that she "wasn't willing to come and pick him up." When Holman went to retrieve J.S.'s clothing, he informed respondent that they could house J.S. for a certain period of time but ultimately hoped to reunite mother and child in her home. Respondent stated that she was unwilling to take her son back, explaining that "he needed help and that he wasn't getting it." Holman informed respondent that TTYC offered individual and family counseling, and respondent dismissed this idea, claiming that she had tried all of that before and that J.S. needed something else.

¶ 9        On cross-examination by respondent's counsel, Holman acknowledged that the underlying reason for his initial meeting with J.S. in April 2010 was J.S.'s arrest after he broke into his neighbor's house and threatened the neighbor with a knife while attempting to conceal his face with a handkerchief. He also testified that J.S.'s transfer to Chicago Lake Shore Hospital for a psychological evaluation was prompted by his homicidal ideations. Finally, Holman stated that J.S.'s behavior had not improved throughout the past two years in which he had been assigned to the case.

¶ 10    The State next called Joy Osayande. Oyasanda is employed as an investigator for DCFS. Oyasande was assigned to the case on June 1, 2011, following J.S.'s placement at the Teen Living Program Bronzeville Youth Shelter. Osayande spoke with respondent on two occasions in an attempt to facilitate a return home for J.S.. Respondent explained that she would not allow J.S. back into the home, citing his repeated out-of-control behavior. Osayande offered to "open the case up for services," meaning that DCFS would enter the home, assess the situation and provide the services necessary to help the family. Respondent declined this offer.

¶ 11    On June 9, 2012, a team decision meeting (TDM) was held. Osayande testified that the purpose of the TDM was to decide whether or not DCFS had enough evidence to take J.S. into custody or if a return home could be facilitated. DCFS first suggested locating J.S.'s father in Mississippi to see if he would take custody of his son. Respondent rejected this idea. DCFS then attempted to have J.S. return home to respondent and open up the case for services. The services being discussed at the time included counseling, a behavioral assessment for J.S., educational assistance through the high school and increased involvement in the upbringing of J.S. by his extended family members. Osayande stated that respondent resisted this suggestion as well. Osayande then informed respondent that if she did not allow J.S. to return to the home, Osayande would be obliged to indicate that it was an "abuse and neglect" rather than a "dependency" case. Osayande explained that dependency only occurs when the child is a threat to the mother or the mother has an issue that would keep her from taking care of the child. Osayande stated that there was not enough evidence to show that J.S. was a threat to his mother. Ultimately, respondent did not allow J.S. back into the home.

¶ 12    Finally, Osayande testified that the following Monday, J.S. was at the DCFS office and telephoned his paternal aunt, who stated she was willing to take custody over J.S. Respondent, however, denied permission for J.S. to be placed with his aunt due to previous bad experiences.[1] Respondent knew that if she agreed to allow J.S. to stay with his paternal aunt, she would still ultimately be responsible for him and he would not be getting the help he needed in Mississippi. At this point, DCFS took protective custody over J.S.

¶ 13    On cross-examination, Osayande admitted that in her initial report she wrote that respondent did not feel comfortable allowing J.S. to return home. The report further stated that respondent had done everything she could to help him, but that J.S. was not responding. Finally, Osayande stated that her report indicated that she wanted J.S. to get more help before returning home.

¶ 14    The State next called Lynesha Kately, who is employed by Teen Living Programs as a

_____

[1]Respondent described one particular incident in which she agreed to allow J.S. to spend the summer in Mississippi at his aunt's house. The purpose of the trip was to allow J.S. to spend more time with his father. After approximately two weeks, J.S. telephoned respondent, complaining that things were not going as he had planned, in particular, he was not spending as much time with his father as he had expected and asked to come home. Respondent was forced to drive back to Mississippi to pick up J.S. and then return home to Illinois.

case manager through the Bronzeville Youth Shelter. Her role is to work in conjunction with the Comprehensive Community Based Youth Services (in this case Thornton Township) to provide a safer, stable housing for the young person who has come to the Bronzeville Youth Shelter. Kately stated that J.S. resided at the shelter from May 31, 2011, when Holman dropped him off, until June 13, 2011, when DCFS gained temporary custody over him. J.S.'s stay at the shelter was without incident, with no reports of violence or fighting. Kately stated that respondent never visited J.S. throughout his two-week stay at the shelter.

¶ 15     Following Ms. Kately's testimony, respondent moved for a directed finding on the abuse charge, arguing that the State had not met its burden that she had caused substantial risk of physical injury. The trial court denied the motion. Respondent then made two motions for a directed finding on the two neglect charges. Likewise, these motions were also denied.

¶ 16     Respondent then testified, delivering a detailed narrative of the events leading up to the lockout of her son J.S. Respondent described what began as a peaceful home environment with mother and son partaking in the usual activities. This, however, all began to change in 2005 when J.S., then in fifth grade, was suspended from school for fighting. Then, while at Gwendolyn Brooks Middle School, J.S. was suspended twice before eventually being expelled in the seventh grade. The incidents included threatening to shoot two classmates, threatening to shoot up the school and damaging property inside the principal's office.

¶ 17     During this same time period, problems were also occurring outside the classroom. In October 2008, respondent was disciplining J.S. when he pulled a knife out of his pocket and refused any discipline. Respondent wrestled the knife out of his hand and called the police. J.S. was arrested and was placed on supervision with a probation officer for two years. The following month, during one of his expulsions from school, J.S. was psychiatrically hospitalized at Hartgrove Hospital after he called 911 threatening to commit suicide. Upon his release from the hospital, J.S. and respondent began the hospital's recommended therapy services with Grand Prairie Social Service Agency (Grand Prairie), which included family counseling and individual therapy for J.S. Grand Prairie discharged J.S. upon successful completion of the services.

¶ 18     Following his expulsion from Gwendolyn Brooks Middle School, the school failed to provide an alternative education plan for J.S.; therefore, respondent sent J.S. to live with her cousin in Wisconsin. Despite the move, J.S.'s pattern of disruption in school continued, getting suspended twice during seventh grade, once for fighting and once for disorderly conduct. J.S. did successfully complete the school year; however, soon after completion, he was forced to return to Illinois as respondent's cousin felt that J.S.'s behavior was unsafe and detrimental to her own children's well-being.

¶ 19     Upon returning to Illinois, J.S. enrolled at Saint Malachy's Catholic School, for eighth grade, in the fall of 2009. J.S.'s behavioral problems continued, and during the second semester, he was asked to leave the school and ultimately was home schooled for the remainder of the year.

¶ 20     In 2009, J.S. was also psychiatrically hospitalized for the second time, this time at Lake Shore Hospital, following his arrest for breaking into a neighbor's home. The hospital made no recommendations at the time; it merely discharged him and stated that he should continue

with therapeutic services through Grand Prairie, which consisted of a counselor coming to the home twice a week.

¶ 21    In the fall of 2010, J.S. began attending Carver Military Academy. While there J.S. had an altercation, a fight with another student, which led to the student being brought to the hospital for injuries and J.S. being arrested for battery. This incident initiated a school investigation, which revealed that respondent did not live in the proper school district. J.S. was asked to leave. Respondent stated that she used a friend's address to enroll J.S. in the school because she felt a military school was the best option for J.S. and that she could not afford the tuition at a private military school. At this point, J.S. returned to therapy at Grand Prairie.

¶ 22    After leaving Carver, J.S. transferred back to his home district school, Thornton Township High School. On his second day attending Thornton Township High School, J.S. sexually harassed a female classmate, stating, in Spanish, that she had a "fat ass." This incident, along with his previous educational history, led school administrators to place J.S. in the district's alternative school, Academy for Learning. While at Academy for Learning, J.S.'s behavioral problems continued. J.S. was suspended three times during the school year. One of these suspensions occurred after he threatened to shoot his teacher.

¶ 23    Following that threat, respondent reached out to J.S.'s counselor at Grand Prairie, seeking assistance based on her frustration with J.S.'s behavior. Grand Prairie then assisted in having J.S. psychiatrically hospitalized once again at Hartgrove. Upon J.S.'s discharge from the hospital, respondent enrolled J.S. in Hartgrove's day program where Hartgrove picked him up in the morning from respondent's home and worked on social and educational issues. J.S. was enrolled in Hartgrove's day program for approximately three weeks before another incident occurred, which led to his expulsion from the program. It was shortly after this incident that J.S. did not come home one night, which led to respondent dropping him off at the police station on May 31, 2011.

¶ 24    Respondent explained that throughout the entire process she had reached out to her family for support, involved J.S. with counseling, youth programs and mentoring programs, sent him to camp and allowed him to participate in sports outside of the home. Respondent stated that J.S. was not receiving the care that she believed he needed. She described two telephone calls she made to the DCFS crisis hotline in 2010. The first phone call resulted in a referral to Grand Prairie, from which she was then already receiving counseling services. The second telephone call resulted in a DCFS worker being sent to the home, who suggested only continuing the Grand Prairie work. This DCFS worker also suggested applying for an individual care grant (ICG), which provides assistance for intensive home services or residential placement. She never completed that application, because she was interrupted by J.S. being hospitalized. At that point, she hoped DCFS would assist in securing a residential placement. Ultimately, respondent believed that she had done everything in her power to assist J.S., stating that she loved him very much and would ultimately love to have him home; however, she wanted him to resolve his behavioral issues so he could live a life of a productive citizen.

¶ 25    The trial court then made J.S.'s Grand Prairie records exhibit part of the record and

admitted the State's one exhibit and J.S.'s TTYC records, along with eight of respondent's exhibits, which included school and psychiatric hospital records.

¶ 26    Following closing arguments, the trial court found J.S. to be neglected due to lack of care pursuant to section 2-3(1)(a) of the Act. The court stated the State had met its burden of proof in this matter and that all of the evidence supported a finding of neglect as opposed to no-fault dependency.

¶ 27    In support of its ruling, the court stated that respondent had not done "everything possible" to keep J.S. in the home or demonstrated that having J.S. return to the home was an imminent threat, finding that she was "willing to do certain things, but not willing to do others." The court found no record of respondent requesting a case study or an individualized education plan from any of the schools that J.S. had attended. The court made particular note of references made within the Grand Prairie records, which stated that respondent did not believe that J.S. needed long-term counseling and had refused family therapy sessions. Ultimately, the trial court held that respondent affirmatively locked J.S. out of the house, refused to allow him to return and refused to allow him to live with his aunt or father. The court held that respondent felt that raising J.S. was too difficult and "made the choice" that having DCFS take custody was the only solution.

¶ 28    On January 30, 2011, a dispositional hearing occurred, which placed J.S. into the custody and guardianship of DCFS.

¶ 29                                              ANALYSIS

¶ 30    On appeal, respondent contends that the trial court's finding of neglect at the adjudication hearing was against the manifest weight of the evidence. Respondent argues that J.S. should be deemed a "dependent" minor due to his behavioral and mental health issues, which continue to worsen, despite psychiatric hospitalizations. Section 2-4(1)(c) of the Act defines a dependent minor as one "who is without proper medical or other remedial care *** or other care necessary for his or her well being through no fault, *neglect* or lack of concern by his parents." (Emphasis added.) 705 ILCS 405/2-4(1)(c) (West 2010). Finally, respondent's notice of appeal states she is appealing both the adjudication and disposition orders. Respondent's brief, however, does not argue that the disposition order was in error or should be reversed. Points not argued are deemed waived. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 31    On review, a trial court's finding of neglect is given great deference and it will not be disturbed absent a showing that the decision was against the manifest weight of evidence. *In re Diamond M.*, 2011 IL App (1st) 111184, ¶ 20; *In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002). A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record. *Christina M.*, 333 Ill App. 3d at 1034.

¶ 32    Neglect, however, does not have a "fixed and measured meaning" (internal quotation marks omitted); rather, it takes its content from the specific circumstances of each case. *Id*. Therefore, cases involving an adjudication of neglect and wardship must be decided on the basis of their own particular facts; each case is *sui generis*. *In re L.H.*, 384 Ill. App. 3d 836, 842 (2008). "In general, 'neglect' is defined as the failure to exercise the care that

circumstances justly demand and encompasses both willful and unintentional disregard of parental duties." *Christina M.*, 333 Ill. App. 3d at 1034. Finally, the sole focus at an adjudicatory hearing is the status of child. *In re Arthur H.*, 212 Ill. 2d 441, 445 (2004).

¶ 33    As relevant to this case, section 2-3(1)(a) of the Act defines neglect due to lack of care as:

"any minor under 18 years of age who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parent or parents or other person or persons responsible for the minor's welfare." 705 ILCS 405/2-3(1)(a) (West 2010).

¶ 34    In sum, respondent's argument consists of a retelling of the facts of the case, highlighting J.S.'s suspensions and expulsions from schools, along with his multiple hospitalizations, in an effort to demonstrate that J.S. is, in fact, a dependent minor. In support of her contention, respondent argues the facts of *In re Christopher S.*, 364 Ill. App. 3d 76 (2006), where the appellate court upheld the trial court's finding that the minor was "dependent," are analogous to the case *sub judice*. We disagree. In *In re Christopher S.*, the State alleged that the minor was neglected due to his home being an injurious environment following the minor's parents' failure to allow him to return home or create a care plan. *Id.* at 78. In *Christopher S.*, a police officer that was familiar with the minor testified that the mother was concerned for her safety, stating that the mother-respondent was terrified of her child. *Id.* at 80. Next, the minor's biological aunt, with whom the respondents reluctantly allowed the minor to live, locked the minor out of her home due to her fear of the minor. *Id.* at 83. Finally, after the minor was not accepted for placement at a psychiatric hospital due to his defiance and lack of openness to therapy, respondents unsuccessfully sought out 43 different agencies and individuals seeking placement for their son. *Id.* Respondents also provided the testimony of two treating doctors who stated it was in the minor's best interest to be placed in a residential placement rather than returning home. *Id.* at 87. Finally, the State specifically asked for a finding of no-fault dependency in its closing argument and it was only the guardian *ad litem* maintaining a request for a finding of neglect due to necessary care, despite its own witnesses' recommendations that the minor remain in residential placement and not return home. *Id.* at 87.

¶ 35    Instead, we find the reasoning in *In re L.H.*, 384 Ill. App. 3d 836 (2008), more akin to the case *sub judice*. There, the court found that in the absence of evidence that the minor was violent or a danger toward the respondent or other family members, respondent's lockout of the minor constituted neglect. In affirming the lower court's findings, this court in *In re L.H.* stated, "Respondent affirmatively locked L.H. out of her home against the advice of the hospital and DCFS, refused to cooperate with DCFS in developing a care plan for L.H., refused to provide alternative placement for L.H. and refused to consider L.H.'s return to her home. Clearly, respondent is responsible for placing L.H. in her current position, and the evidence supports classifying L.H. as neglected rather than dependent." *Id.* at 842-43. See also *In re Christina M.*, 333 Ill. App. 3d 1030, 1035 (2002) (where this court upheld a finding of neglect despite the respondent's plea to find the minor dependent when the

respondent affirmatively locked out the minor and refused to participate in facilitating a care plan for the minor).

¶ 36    In this case, the record reflects that respondent affirmatively locked J.S. out of her home, refused to take J.S. home when he was placed in the temporary shelter, refused DCFS' request to inquire into the possibility of the child living with his father, and failed to make any sort of care plan for J.S.'s emotional and behavioral disturbances at school. Thus, the trial court's finding that J.S. was a neglected minor is not against the manifest weight of the evidence. The judgment of the trial court is accordingly affirmed.

¶ 37    Affirmed.