2020 IL App (1st) 200361-U
Order filed June 5, 2020

FIRST DISTRICT
FIFTH DIVISION

Nos. 1-20-0361

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* D.E., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 19 JA 1216 |
| v. | ) | |
| | ) | |
| Sherry E., | ) | Honorable |
| | ) | Maxwell Griffin, Jr., |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding of neglect due to lack of care is affirmed where the evidence showed respondent mother refused to pick up the minor from the hospital, refused to allow the minor to return home, and made little to no effort to create an alternative care plan.

¶ 2     Sherry E. (the mother), respondent-appellant, appeals from the circuit court's adjudication order finding her minor adopted daughter, D.E. (the minor), born on May 19, 2004, neglected due to lack of care. Brandon E. (the father), D.E.'s adoptive father, is not a party to this appeal. We affirm.[1]

¶ 3     In October 2019, Ingalls Memorial Hospital (Ingalls) informed the Illinois Department of Children and Family Services (DCFS) that the mother had not picked up D.E., 15 years old, when D.E. was ready to be discharged.

¶ 4     On October 25, 2019 the State filed a petition for adjudication (petition) of wardship against the mother and the father, which contended that D.E. was neglected or abused pursuant to sections 405/2-3(1)(a) [lack of care], 405/2-3(1)(b) [injurious environment], and 405/2-3(2)(ii) [substantial risk of physical injury] of the Juvenile Court Act of 1987 (Act). 705 ILCS 405/2-3(1)(a), 2-3(1)(b), 2-3(2)(ii) (West 2018). As alleged in the petition, in October 2019, the minor was psychiatrically hospitalized and diagnosed with major depressive disorder. When the minor was ready for discharge, the mother refused to pick her up and failed to create an alternative care plan. Additionally, the mother refused to engage in services which were offered by DCFS to stabilize the minor at home.

¶ 5     The State also filed a motion for temporary custody, alleging that there was probable cause that D.E. was neglected and abused as detailed in the petition and that reasonable efforts could not prevent or eliminate the necessity of removing D.E. from her home. Based on the parties'

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

stipulation of facts,[2] the court entered a temporary custody order finding that probable cause existed that D.E. was abused or neglected and that there was an immediate and urgent necessity to support D.E.'s removal from the home. The order further stated that DCFS offered services to D.E. at home, but the mother refused to participate. The court placed D.E. in the guardianship of DCFS and appointed the Public Guardian as D.E.'s guardian *ad litem* (GAL).

¶ 6    On January 28, 2020, the court conducted an adjudication hearing.

¶ 7    Melissa Wraggs, a child protection investigator for DCFS, testified that she was assigned to this case in October 2019 for the purpose of investigating a "lockout." Hospital personnel from Ingalls had informed DCFS that D.E. was ready to be discharged, but the mother was refusing to pick her up. During a phone call, on October 11, 2019, the mother told Wraggs that she would not pick up D.E. from the hospital because D.E. still had "issues that needed to be addressed." Wraggs discussed services with the mother, but could not recall the extent of the offered services. The mother also refused to provide a care plan whereby DCFS could place D.E. with a responsible person. On October 16, 2019, the mother, again, informed Wraggs that she would not pick up D.E., allow her to come home, or provide an alternative care plan. Wraggs then explained to the mother that DCFS would take protective custody of D.E.

¶ 8    On or around October 17, 2019, an employee from, CCYBS,[3] went to Ingalls to pick up D.E. and make an emergency placement. After the CCYBS employee spoke with D.E., she ran away from the hospital and could not immediately be found.

---

[2] The parties stipulated that Melissa Wraggs, a child protection investigator for DCFS would testify to the following facts. D.E. was born on May 19, 2004. D.E. was psychiatrically hospitalized in October 2019. D.E. has been diagnosed with major depressive disorder. Once D.E. was ready for discharge, the mother refused to pick her up. The mother failed to create an alternative care plan for D.E. DCFS offered services to stabilize D.E. at home, but the mother refused to participate.

[3] Wraggs was not working on that specific date, which necessitated utilizing a separate agency. The proper name of the agency is not contained in the record.

¶ 9     On October 21, 2019, after learning that D.E. had run away, Wraggs called the father. He was not aware of D.E.'s circumstances, was not living in the home with her, and had not spoken with her in approximately six months. DCFS determined that D.E. could not be placed with the father as he reported he was living with someone and could not provide a stable home.

¶ 10    On or around October 23, 2019, Wraggs located D.E. at the home of Makayla[4] Ford, whom Wraggs referred to as a fictive kin[5]. Wraggs concluded that Ford was not an appropriate placement in that she had prior involvement with DCFS, which resulted in an indicated report. Sharon I., D.E.'s biological grandmother, was also not an appropriate placement due to an indicated DCFS report which occurred approximately 20 years ago.

¶ 11    During this time, Wraggs had not been able to reach the mother for about a week. The mother later admitted that she had been out of the country.

¶ 12    On October 23, 2019, with no alternative placement options, DCFS took protective custody of D.E. Upon the mother's return, she told Wraggs that she believed that D.E. belonged in DCFS's care and continued to refuse to pick her up, allow her to come home, or provide an alternative care plan. Wraggs testified that D.E. did not want to go home and wanted to stay with Ford.

¶ 13    On cross-examination by the mother, Wraggs agreed that the mother did express concern about D.E.'s mental health issues and her history of "runaway behavior." The mother allowed D.E. to stay with her biological mother during the summer of 2019. The mother revealed that D.E. had tried to attack her siblings, but did not disclose any specific details. The mother also claimed that DCFS and other agencies had failed to help her in the past with D.E.

---

[4] The record notes this is a phonetic spelling.
[5] The record uses the term "fixative kin" which appears to be in error.

¶ 14    D.E.'s certified medical records from Ingalls (People's Group Exhibit 1A) were admitted into evidence. As relevant to this appeal, the medical records revealed the following.

¶ 15    D.E. was admitted to Ingalls on October 6, 2019 and diagnosed with "disruptive mood dysregulation disorder" and "depressive disorder, unspecified." On October 8, D.E. and the mother attended a behavior health assessment in which a therapist recommended an intensive outpatient treatment for D.E. upon discharge.

¶ 16    On October 10, 2019, hospital personnel informed the mother that D.E. was discharged. The mother refused to pick her up and stated that they had "to place her somewhere" and "deal with her." After being "informed about a [l]ockout and what it means" the mother responded with "I don't care" and "hung up the phone."

¶ 17    Although D.E. had been calm and cooperative during most of her hospitalization, on October 13, 2019, D.E. became agitated, and was screaming and hitting; "someone" was injured. After receiving an injection, D.E. calmed down and apologized to the staff for her behavior. On October 14, D.E. was restless and believed she was having a "panic attack." She received another injection, which eased her agitation. D.E. began a new medication on October 15.

¶ 18    On October 16, 2019, hospital personnel again spoke with the mother who still refused to bring D.E. home and to give permission for another family member to pick her up. She stated, "do what you want, call DCFS." When hospital personnel informed D.E. that the mother was not going to pick her up, D.E. stated "she doesn't care about me, she doesn[']t want me and she doesn[']t want me to be with my grandma or my momma." D.E. remained calm and cooperative through October 17, the day she was finally discharged.

¶ 19    The mother testified that she and the biological mother are cousins. She adopted D.E. and her two brothers in 2010.

¶ 20    In April 2019, D.E. ran away to live with the biological mother, the biological grandmother, and Ford. The mother allowed D.E. to reside with them during the summer and maintained "on and off" contact with her. In June, D.E.'s brothers visited her, and they reported that D.E. had "attacked" them. The mother did not see this attack and agreed with the court that this testimony was hearsay. Based on the brothers' reports, the mother became concerned and told D.E. to come home; D.E. refused. According to the mother, the biological mother, the biological grandmother, and Ford were "hiding [D.E.] out for months" and she considered D.E. as "on the run." The mother filed a "runaway report" and a missing person report. Neither report is part of the record.

¶ 21    In October 2019, D.E. wished to return home so she could go to school. D.E.'s biological family members dropped her off at a Chicago bus station at 4:00 a.m. The police found D.E. waiting for a bus and contacted the mother. The mother went to the police station, "they called an ambulance, *** and we took her to Ingalls so she could get evaluated because of the missing persons [and] runaway report[.]"

¶ 22    Prior to October 2019, D.E. had not been hospitalized or prescribed medication, but was prescribed medication during her stay. While receiving care, a hospital social worker informed the mother that D.E. had "attacked" a hospital employee. After this incident, the mother consented to a change in D.E.'s medication.

¶ 23    In mid-October 2019, the mother informed a social worker at Ingalls that D.E. had behavioral issues and needed "psychological care." The mother told hospital personnel that D.E. needed a care plan and wanted the hospital to conduct a clinical staffing.

¶ 24    On October 7 and 8, the mother contacted some inpatient behavioral residential facilities, including Indian Oaks Academy, Riveredge Hospital, Mercy Home, and Hartgrove. She found the facilities through a google search for residential treatment. The facilities either had wait lists, could

not accommodate D.E., or required that D.E. agree to the inpatient treatment. The mother told Riveredge staff that "[D.E.] was a runaway and that she had behavioral issues" but did not disclose D.E.'s diagnosis or prescribed medication.

¶ 25    The mother admitted that on October 10, 2019 she refused to pick up D.E. or give permission for someone else to do so after being told that D.E. was ready to be discharged. After DCFS began to investigate the situation as a lockout, she did not provide an "exact care plan," but informed Wraggs that she was "looking into finding other sources." She asked Wraggs for assistance. The mother was out of the country from October 19, 2019 until October 24, 2019 and that is why Wraggs could not contact her during the investigation. The mother admitted that she left the country knowing that D.E. was ready to be discharged.

¶ 26    On questions by the court, the mother testified that, upon admission to Ingalls, D.E. was diagnosed with major depressive order, but she did not know D.E.'s diagnosis upon discharge. The mother would not allow D.E. back into her home because she believed D.E. was a "harm to herself and others," and that she would run away again. The mother said Ingalls did not establish a plan for D.E.'s follow-up care, but instead, relied on the mother to contact DCFS to implement a care plan.

¶ 27    During closing arguments, the State and the GAL maintained that the evidence established that D.E. had been neglected. In response, the mother sought a dependency finding under section 2-4(1)(c) of the Act (705 ILCS 405/2-4(1)(c) (West 2018)).

¶ 28    At the close of the adjudicatory hearing, the circuit court orally found that D.E. had been neglected due to lack of care and rejected the mother's arguments that the evidence supported a dependency finding. The court noted that D.E. had no prior hospitalizations and the mother "was

clear she did not want to have this child returned to her for reasons being that she felt the child needed additional care outside of the home." The circuit court further stated:

"the actions that [the mother] took ultimately are consistent with the finding of the alleged lockout and the definition of lack of care, including after learning that they wanted to discharge [D.E.] and the care plan needed to be made, [the mother] took time to take to [*sic*] trip to Europe. I just don't see that as consistent with Dependency C finding[.]"

¶ 29 The circuit court then proceeded to a disposition hearing.

¶ 30 Rolanda Jones, a case worker for DCFS testified that she was assigned to D.E.'s case in October 2019. DCFS took custody of D.E. at the end of October and placed her in a temporary emergency foster home. After about three weeks, D.E. ran away. On December 19, 2019, D.E. was placed with Ford, an unauthorized placement. Three children, ages 7, 11, and 15 also reside with Ford, the only adult in the home. Ford had two indicated reports, in 2014 and 2015, for inadequate supervision of her children. However, the court was never involved and Ford never lost custody of her children. D.E. feels connected to Ford and has said that if removed from Ford's home, she would run away again.

¶ 31 On January 10, 2020, Jones visited Ford's home and found it to be safe and appropriate. There were no signs of abuse, neglect, or corporal punishment and no unusual incidents to report. Ford keeps in contact with Jones. DCFS is working on obtaining a waiver for this placement.

¶ 32 D.E. has not gone to school since April 2019. The mother did not know the reasons for her absence from school. At a recent physical, D.E. learned she was pregnant. D.E. had been compliant with her medication. However, Jones believes D.E. has stopped taking her medication due to her pregnancy. Jones referred D.E. for services, which would allow D.E. to remain in Ford's home and provide for D.E.'s therapy and psychiatric needs.

¶ 33    The mother has not been assessed for services, and has had no contact with D.E.; there is no visitation plan. The mother told Jones that she did not want to have anything to do with D.E. or the court proceedings as "she was done." D.E. is not interested in visiting with the mother. There has been no contact between D.E. and the mother. The mother has refused to participate in mediation.[6]

¶ 34    Jones recommended that D.E. remain in her current placement. DCFS recommended that D.E. be adjudicated a ward of the court.

¶ 35    On January 28, 2020, the circuit court entered an order with its adjudication finding that D.E. was abused or neglected due to lack of care pursuant to section 405/2-3(1)(a) of the Act. The court also entered a disposition order, which found that the mother was unable and unwilling for some reason other than financial circumstances alone to care for, protect, train, or discipline D.E., reasonable efforts had been made to prevent or eliminate the need for removal of D.E. from the home, appropriate services aimed at family preservation and family reunification had been unsuccessful, and that it is in the best interest of the minor to remove her from the custody of the mother and the father. D.E. was placed in the custody of DCFS. The circuit court also entered a permanency order with a goal of return home in 12 months stating that D.E. was in need of services and that the mother was in need of an assessment for services.

¶ 36    The mother timely appealed.

¶ 37    On appeal, the mother argues that the circuit court's finding that D.E. was a neglected minor due to lack of care was against the manifest weight of the evidence and, instead, the evidence supported a finding of no-fault dependency section 2-4(1)(c) of the Act (705 ILCS 405/2-4(1)(c)).

---

[6] The father has not been assessed for services and he failed to show up for his scheduled mediation. There is no current visitation plan for the father and there has not been any contact between D.E. and the father.

¶ 38    The Act provides a "step-by-step" process for deciding whether a child should be removed from his or her parents, made a ward of the court, and whether parental rights should be terminated. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary custody, the circuit court first must determine whether a child is abused, neglected, or dependent, before it conducts an adjudication of wardship and dispositional hearing. *Id.*; 705 ILCS 405/221 (1), (2) (West 2016). It is the State's burden to prove allegations of abuse or neglect by the preponderance of the evidence (*In re A.P.*, 2012 IL 113875, ¶ 17), which means the State must prove that the allegations of neglect are "more probable than not." *In re N.B.*, 191 Ill. 2d 338, 343 (2000).

¶ 39    The trier of fact is afforded broad discretion (*In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 32), and we will not disturb the circuit court's determinations unless they are against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). A determination is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or the determination is unreasonable arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). We "give[] deference to the [circuit] court's findings of fact as the [circuit] court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence" presented at adjudicatory and dispositional hearings. *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006). "Further, due to the delicacy and difficulty of child custody cases, it is well settled that wide discretion is vested in the [circuit court] to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." (Internal quotation marks omitted.) *In re R.S.*, 382 Ill. App. 3d 453, 459-60 (2008).

¶ 40    The purpose of an adjudicatory hearing is to determine whether the minor is neglected, and not whether the parents are neglectful. *In re Arthur H.*, 212 Ill. 2d at 253. The Act defines a

"neglected minor" as one "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing, and shelter." 705 ILCS 405/2-3(1)(a) (West 2018). A dependent minor is one "who is without proper medical or remedial care recognized under State law or other care necessary for his or her well-being through no fault, neglect[,] or lack of concern by [her] parents, guardian[,] or custodian." 705 ILCS 405/2-4(1)(c).

¶ 41    The mother argues that the facts supported a finding of dependency where D.E. exhibited aggressive behavior and had a "history of running away" and the mother had contacted multiple inpatient care facilities to address those issues. The State and GAL maintain that the evidence demonstrated that the mother had disinvested herself of D.E. and that D.E. had been neglected for lack of care. We agree with the State and GAL.

¶ 42    Cases adjudicating wardship based on allegations of neglect "are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463. "Generally, 'neglect' is defined as the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties." *In re Christopher S.*, 364 Ill. App. 3d 76, 88 (2006) (citing *Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002)).

¶ 43    Here, the circuit court's finding that D.E. was neglected due to lack of care was not against the manifest weight of the evidence. The mother allowed D.E. to stay with the biological mother, grandmother, and Ford from April 2019 through the time the police found her in October. During this time period, the mother had little contact with D.E. D.E. stopped attending school.

¶ 44    After D.E. was found at the bus stop, she was taken to Ingalls by ambulance on October 6, 2019 and diagnosed with "disruptive mood dysregulation disorder" and "depressive disorder,

unspecified." When D.E. was ready to be discharged, during an October 10 phone call, the mother told hospital personnel that she would not pick up D.E. or allow anyone else to do so, and that someone would have to find a place for D.E. to go. When warned that her refusals constituted a lockout, the mother responded with "I don't care" and ended the phone call. Six days later, the mother again refused the hospital's request to pick up D.E. and told hospital personnel they could do whatever they wanted with D.E., including contacting DCFS. At the same time, the mother refused to cooperate with Wraggs' initial requests that she bring D.E. home or provide an alternative care plan. The mother then left the country for six days and could not be reached. Even after she returned, she again ignored Wraggs' requests and refused to bring D.E. home or to provide alternative care.

¶ 45    The mother maintains that she could not bring D.E. home from Ingalls because D.E. was a danger to herself and others as demonstrated by her aggressive behavior towards hospital staff and her brothers. However, these concerns are not supported by the record. According to the medical records, D.E. for the most part was calm and cooperative during her stay, except for an incident which took place on October 13, 2019, three days after D.E. would have been discharged if the mother had not refused to pick her up. Thus, the mother had decided to prevent D.E. from returning home before the altercation at the hospital. Further, D.E. calmed down shortly after the incident and apologized to the staff. As to the occasion of alleged aggression towards her brothers, the mother was not present at that time, could offer no details, and had no first-hand knowledge.

¶ 46    Even if these concerns were supported by the record, the mother refused to create an alternative care plan or give permission for someone else to pick up D.E. With no plan in place, the mother left the country. We conclude that the manifest weight of the evidence supports the circuit court's conclusion that D.E. was neglected due to lack of care.

¶ 47    The court also did not err in failing to make a dependency finding. No-fault dependency can be found only where there is no fault, no neglect, and no lack of concern by the parents. *In re L.H.*, 384 Ill. App. 3d 836, 842-43 (2008). In the absence of evidence that the child was violent or a danger toward the parent or other family members, a parent's lockout of the child constitutes neglect. *In re L.H.*, 384 Ill. App. 3d 842-43 (2008). The parents must make continual good-faith efforts to meet the minor's needs. *In re Z.L.*, 379 Ill. App. 3d 353, 381 (2008). Further, a finding of dependency is not appropriate where the parents made little to no effort to find alternative care and showed no interest in participating in services and where the minor did not present any real physical danger. *In re Rayshawn H.*, 2014 IL App (1st) 132178, ¶¶ 28-30.

¶ 48    The mother relies on *In re Christopher S.*, 364 Ill. App. 3d 76 (2006), in which the minor was held to be dependent rather than neglected where the evidence established that the minor had a long history of behavioral problems and was verbally and physically intimidating towards his parents. *Id.* 839. Further, the parents were willing to engage in services and contacted "over 43 different agencies and individuals" to find alternative care for the minor. *Id.*

¶ 49    We find this case distinguishable as the record did not establish that D.E. was aggressive towards the mother or that she had a long history of behavioral problems. And the mother showed a lack of care for D.E.'s well-being and did not make a good faith effort to find her proper treatment and a place to live. Instead, unlike the parents in *Christopher S.*, the mother made a unilateral assessment that D.E. needed residential treatment, even though hospital personnel recommended intensive outpatient treatment and only contacted a handful of placements.

¶ 50    We find *In re Rayshawn H.*, 2014 IL App (1st) 132178 and *In re J.S.*, 2012 IL App (1st) 120615, cited by the State and the GAL, more instructive. In *Rayshawn H.* and *J.S.*, both concerning lockouts, this court upheld the circuit court's finding of neglect rather than dependency.

*Rayshawn H.*, 2014 IL App (1st) 132178, ¶ 17; *J.S.*, 2012 IL App (1st) 120615, ¶ 36. In *Rayshawn H.*, we distinguished *Christopher S.*, finding that, the mother "made little to no effort in finding alternative living arrangements;" the minor did not exhibit physically aggressive behavior toward the mother, did not harm her, and did not present any real danger to her;" and the mother "showed no interest in engaging in support services offered by DCFS." *Id.* ¶¶ 28-30. Similarly in *J.S.*, this court relied on the mother's refusal to allow the minor to return home, the mother's failure to cooperate with DCFS in arranging alternative living arrangements, and refusal to create a care plan to affirm the finding of neglect. *J.S.*, 2012 IL App (1st) 120615, ¶ 36.

¶ 51    The analyses in *Rayshawn H. and J.S.* support the circuit court's finding that D.E. was neglected due to lack of care rather than a finding of dependency. The mother affirmatively locked D.E. out of her home, refused to take her in when she was discharged from Ingalls, and failed to create an alternative care plan or make a good faith effort to find D.E. treatment as recommended by Ingalls.

¶ 52    For these reasons, we find the circuit court's neglect finding was supported by the record and an opposite conclusion was not clearly apparent. We affirm the circuit court's adjudicatory and dispositional orders.

¶ 53    Affirmed.