# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:1em;">

*In re Tatiana C.*, 2013 IL App (1st) 131573

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* TATIANA C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Samantha C., Respondent-Appellant). |
| | |
| District & No. | First District, Third Division<br>Docket No. 1-13-1573 |
| | |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | October 13, 2013<br><br>December 16, 2013<br>December 18, 2013 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's adjudication of respondent's daughter a neglected minor due to the lack of proper care and the order making the daughter a ward of the court under protective supervision while remaining in respondent's care were upheld, notwithstanding respondent's contention that the finding of neglect was against the manifest weight of the evidence, since respondent's two other children were not in her custody when the instant petition was filed, she had been diagnosed with bipolar disorder, she had a history of psychiatric hospitalizations and substance abuse, she refused services that were offered, no paternity was established and the putative father was unknown, the daughter missed a "staggering number of days of school" due to her mother's problems, and based on the showing that the daughter is "not receiving the proper or necessary support, education as required by law or medical or other remedial care recognized under State law as necessary for a minor's well-being," the record supported the adjudicatory order. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-JA-700; the Hon. Richard A. Stevens, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on Appeal | Anthony M. Petrone, of Law Offices of Anthony M. Petrone, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People. |
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Susan S. Wigoda, of counsel), guardian *ad litem.* |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion. |

## OPINION

¶ 1 Following an adjudication hearing under the Illinois Juvenile Court Act of 1987 (Act or Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2010)), the circuit court found that Tatiana C. was a neglected minor. In the disposition hearing that followed, the court made Tatiana a ward of the court and entered an order of protective supervision, allowing Tatiana to remain in the care of her mother, respondent Samantha C. On appeal, Samantha contests the court's adjudication finding that her daughter was neglected, arguing that the finding is against the manifest weight of the evidence. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 2 I. BACKGROUND

¶ 3 Tatiana C. was born on June 4, 2004. Samantha C. is her natural mother. Tatiana has two biological brothers, Ishtiel C. and Jahmial C. Neither of Samantha's other children was in her custody and care when the State filed a petition for adjudication of wardship on behalf of Tatiana on July 9, 2012. In the petition, the State alleged that Tatiana was "neglected" as that term is defined in the Act (705 ILCS 405/2-3 (West 2008)). Specifically, the State alleged that Tatiana was not receiving proper support, education, medical or remedial care necessary for her well-being (705 ILCS 405/2-3(1)(a) (West 2010)) and that she was being subjected to an environment that was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2010)). The State further alleged that Tatiana was also an "abused" minor as that term is defined in the Act

- 2 -

because she was at "substantial risk" for physical injury (705 ILCS 405/2-3(2)(ii) (West 2010)). In support of the allegations of abuse and neglect, the State stated as follows:

> "Mother has two other children that were previously in [Department of Children and Family Services (DCFS)] care and custody with findings of abuse, neglect, physical abuse and excessive corporal punishment having been entered. Mother has been diagnosed with bipolar disorder and has been prescribed multiple psychotropic medications. Mother has a history of psychiatric hospitalizations and drug/alcohol abuse. Mother has admitted to an incident when she blacked out to excessive drinking of alcohol; the minor was present. Mother stated that she had taken her psychotropic medication at the time of the incident. Mother has been observed to have bruises and other injuries about her face; mother admitted the bruising came from falling due to being drunk. Mother has been sporadically compliant with psychiatric follow-up. Minor has missed multiple days of school; mother states she is too tired due to her medications to take the minor to school. Intact services were offered to this family to stabilize the family unit; mother refused. Putative father is unknown. Paternity has not been established."[1]

¶ 4 The cause subsequently proceeded to an adjudication hearing.

¶ 5 At the hearing, Emily Lemke testified that she was a community support specialist at Thresholds, a mental health agency that provides support to individuals suffering from mental illness. In her capacity as a community support specialist, Lemke testified that she provides individuals with counseling, coaching, and case management to assist them with their recovery goals.

¶ 6 Lemke first met Samantha in February 2012, after a friend had referred her to Thresholds, and continued to work with her on an ongoing basis. During a telephone conversation on March 15, 2012, Samantha described herself as depressed. She classified her level of depression as "60%" and reported that she "had trouble helping Tatiana get up and get to school" because she struggled to get herself out of bed. Lemke acknowledged that she did not ask Samantha exactly what she meant when she described herself as "60% depressed." Lemke also did not ask how many days of school that Tatiana had missed as a result of Samantha's depression.

¶ 7 On April 4, 2012, Lemke visited Samantha at her home and observed scrapes and bruising on Samantha's face. Samantha explained that she had consumed alcohol and Xanax the night before while she was at her mother's house and had blacked out and fell against a brick wall. She also reported that she had gotten into "a physical altercation with some of the others that were there." Although Tatiana "was there," at Samantha's mother's house, Samantha indicated that her daughter was sleeping at the time of the incident. Samantha claimed that the previous night was the first time that she had taken a Xanax and that she had never consumed alcohol and Xanax together before. She was aware, however, that her Xanax prescription warned against consuming alcohol while taking the pills.

---

[1]Sorin P. is Tatiana's biological father. He did not participate in any of the circuit court proceedings and is not a party to this appeal.

¶ 8        Lemke next met with Samantha on April 10, 2012. When she arrived, it was evident that Samantha had just woken up. Samantha complained of a headache and told Lemke that she might have a concussion. Although Samantha's wounds appeared to be healing, Lemke noticed that she had two black eyes. Samantha claimed that the black eyes were from the previous incident. Lemke did not recall whether she had seen any indication of bruising around Samantha's eyes during their previous visit. Although the April 10, 2012, visit took place during school hours, she found Tatiana at home with her mother rather than in school. It appeared that Tatiana had also been sleeping.

¶ 9        During the visit, Lemke became concerned as to whether Samantha was capable of caring for Tatiana. She was specifically concerned that Samantha's depression and substance abuse prevented her from ensuring that her daughter attended school. Lemke acknowledged that Samantha did not report drinking or taking Xanax the night before the April 10, 2012, visit. However, she was aware that Samantha had a history of substance abuse and Samantha had indicated that she was "currently thinking about getting back into a 12-step program."

¶ 10       Lemke testified that her working relationship with Samantha terminated at the end of April 2012. She explained that she had made a call to DCFS and had relayed her concerns about Samantha's ability to parent Tatiana. Samantha was upset about the call to DCFS and responded by filing complaints with Lemke's supervisor at Thresholds. After it was determined that Lemke could no longer have a positive therapeutic relationship with Samantha, Lemke continued her employment at Thresholds but no longer continued to meet with Samantha.

¶ 11       Rosalind Wiekerson was the DCFS investigator assigned to Tatiana's case after a call had been placed to the DCFS hotline in April 2012. According to the hotline report, Samantha had acknowledged drinking and experiencing blackouts in the presence of her daughter. It was also reported that Samantha was having difficulties getting out of bed and getting Tatiana to school.

¶ 12       Wiekerson testified that she first met with Samantha on May 4, 2012. During their initial conversation, Samantha denied drinking alcohol or using drugs. She also denied experiencing any blackouts as a result of substance abuse. Samantha indicated that she had been involved in prior investigations conducted by DCFS with respect to her other children and knew "how all of this works." During their initial meeting, Samantha reported having family, but denied having close relationships with any of them. She also acknowledged that she had experienced homelessness, mental illness, and surgeries during the previous year.

¶ 13       Wiekerson next spoke to Samantha on June 27, 2012. During their phone conversation, Samantha admitted that Tatiana had missed "100 plus days" of school over the past year, but that she still earned A's and B's in her classes. Although Samantha was offered intact services, she declined help, explaining that "everyone has some kind of mental health [problem], and she knows how to take care of hers." Samantha also indicated that she had been taking advantage of other community-based services since 1995; however, she did not identify what those services were. Ultimately, Samantha declined DCFS help unless the agency could provide her with money for child support and a trip to Disneyland.

¶ 14       Based on her conversations with Samantha, Wiekerson believed that Tatiana was at risk for harm. She explained that Samantha's mental health issues compromised her ability to take

Tatiana to school. In addition, Wiekerson noted that Samantha had not followed through with any of the mental health services that DCFS had recommended to her. Wiekerson was also concerned about the effect that Samantha's use of psychotropic medication and her consumption of alcohol had on her daughter. Although Wiekerson believed that Tatiana was at risk for harm, she supported allowing Tatiana to remain in her mother's care pursuant to an order of protection. She explained that while Samantha had shown herself to be inconsistent with her services, she did allow DCFS to come to her house. Wiekerson noted that Samantha's house appeared to be clean and that there was no evidence that Tatiana was upset by or afraid of her mother; rather, the two appeared to share a close bond. Moreover, aside from Samantha's own admissions, nobody from DCFS had observed Samantha appear to be intoxicated while in the presence of her daughter. Finally, although Tatiana had been absent from school on a number of occasions, Wiekerson had confirmed with Tatiana's teacher that she was receiving passing grades.

¶ 15    On cross-examination, Wiekerson clarified that the services with which Samantha had been inconsistent were services that she had sought out on her own. Moreover, although Samantha had threatened to kill Wiekerson during a phone call when Wiekerson had first been assigned to the case, Wiekerson did not fear that she was at imminent risk of harm.

¶ 16    After presenting the aforementioned testimony, the State entered a number of exhibits into the record including Tatiana's school records and notes that Samantha had written to the school providing reasons for Tatiana's numerous absences. The notes blamed Tatiana's absences on illness, injury, and deaths in the family. Tatiana's school records reflected that she missed 56.5 days of school in 2010 and missed 79 days of school in 2011. Although she maintained passing grades both years, Tatiana's reading and writing grades fell from A's to C's in 2011. The State also presented records of a conversation that had taken place between Samantha and a psychiatrist at Thresholds. During the consultation, Samantha had reported that she was diagnosed with bipolar disorder in 1996 and had abused drugs and alcohol. She also admitted to having a long history of cocaine dependence. Finally, Samantha informed the doctor that she had been hospitalized for psychiatric reasons on a number of occasions and had attempted to commit suicide three times. Her last hospitalization was in 2010 during a manic episode.

¶ 17    Shirley W., Samantha's mother, was then called to testify on her daughter's behalf. She testified that Samantha and Tatiana visited her approximately one to two times per month. Shirley recalled that Tatiana had stayed with her for several days during her spring break in 2012, but she did not remember the exact dates. Other family members were staying there as well. Shirley did not recall ever seeing Samantha drink alcohol or take prescription drugs during that time. She also did not see Samantha get involved in a physical altercation with other members of the family. Shirley confirmed, however, that she was not always in the presence of her daughter when Samantha spent time at the house.

¶ 18    Aisha W. testified that she was Samantha's sister and was employed as a registered nurse. She recalled that on April 2, 2012, she was at home with her mother and two children when Samantha arrived with Tatiana. At around 6:30 p.m., she and Samantha decided to visit one of Samantha's friends. Tatiana was left in the care of her grandmother and Aisha's 18-year-old

daughter. Aisha saw her sister consume two alcoholic beverages during the visit. She noticed that Samantha "started to get a little tipsy" after consuming the drinks and that she started slurring her speech. After Aisha learned that Samantha had taken antianxiety medication prior to drinking, she realized that the combination of the alcohol and psychotropic medication was the reason for her sister's condition. Aisha then told her sister that it was time to go and began gathering their belongings. As Samantha followed her out of the front door, she stumbled and fell down the stairs, sustaining contusions and abrasions to her face. When they arrived back at Aisha's residence, she got her sister some ice packs and put her to bed. Aisha denied that she saw Samantha get involved in a physical altercation that night. Samantha woke up the following day and appeared to be "fine." Aisha drove her home.

¶ 19    Samantha testified on her own behalf. She informed the court that she had developed fibroids in June 2011 and underwent surgery in September of that year. Although it takes about a year to recover from abdominal surgery, Samantha's recovery period was five months. During her recovery, Tatiana continued to attend school but missed some days due to her mother's recovery. Samantha home-schooled her daughter when she was unable to take her to school. She explained that she was equipped to educate Tatiana because she has raised her and was aware of her daughter's academic abilities. Moreover, when Tatiana missed school, one of Samantha's neighbors, who had a child in Tatiana's class, brought Tatiana's schoolwork home. Although she agreed that it was important for Tatiana to consistently attend school, Samantha indicated that she did not ask her neighbor to take Tatiana to school on days when Samantha was unable to do so because she did not know the neighbor that well and because she "care[d] a lot about [her] kid." Samantha and her daughter lived less than one mile from Tatiana's school. No records pertaining to Samantha's surgery were provided to DCFS investigators.

¶ 20    Samantha testified that before she sought assistance from Thresholds, she was receiving services at another organization called C4. Although she had been going to C4 for years, Samantha sought out additional resources when C4 failed to provide her with housing assistance. When Samantha spoke to Emily Lemke, she described herself to be at "60%." She clarified that she made this comment when she was recuperating from surgery and that she felt "60% overall, meaning mentally, physically, spiritually and emotionally[, and] financially" at that time.

¶ 21    Samantha also provided details about the circumstances that led to her fall on April 2, 2012. She explained that she had seen her psychiatrist, Dr. Rupert, earlier that day. He had prescribed her three different medications, including Xanax, a medication that Samantha had never taken before. She took half a pill after receiving the prescription and ingested the second half of the pill later that evening when she was at a friend's house. Samantha consumed two margaritas while she socialized with her friend. She recalled feeling woozy and testified that she woke up on the ground. Samantha's sister took care of her after her fall and brought her to their mother's house. Since that night, Samantha had never ingested Xanax and alcohol together. She explained that she was now aware that it was a dangerous and potentially fatal combination.

¶ 22    When Samantha met with Lemke on April 10, 2012, she remembered reporting that her head was throbbing and that she thought she may have had a concussion. She felt like her "brain was swimming in fluid" and recalled that "any movement caused [her] pain." Samantha testified that the black eyes that Lemke observed that day were the result of her fall. She explained when she fell, she hit the bridge of her nose on the ground. The bruising developed over a four-day period and lasted for about two weeks. Despite her injuries and her fear that she had a concussion, Samantha never went to the hospital or sought out medical treatment.

¶ 23    Some time after seeking out assistance at Thresholds, Samantha learned that a call had been made to the DCFS hotline. When she spoke with Rosalind Wiekerson, Samantha asked who had made the hotline call, but the investigator said she could not disclose that information. Samantha did permit Wiekerson to come by her home to speak with her and Tatiana. She confirmed that she declined intact family services that Wiekerson had offered to her because she had already sought out services and knew "how to provide for whatever it [was] that [she] felt that [she] need[ed]." Although Wiekerson asked Samantha to provide details about the services that she had sought out, Samantha acknowledged that she declined to provide her with that information, explaining that it was "none of [Wiekerson's] business" and because she [did not] "know her from the man on the moon." Samantha had no recollection of ever threatening Wiekerson.

¶ 24    Samantha indicated that she currently attends AA meetings. She goes to the meetings "whenever [she] feel[s] like it," but "[d]efinitely once a week." Samantha also acknowledged her previous hospitalizations for mental health problems. Her most recent hospitalization was in 2010. She testified that she had gone to the emergency room at Illinois Masonic Hospital and requested hospitalization because she "wasn't able to sleep well." That hospitalization lasted approximately four days. Tatiana's grandmother cared for her while Samantha was in the hospital. Samantha ultimately left the hospital after receiving a prescription for a sleep aid. She was not prescribed any additional medication or advised to seek out psychiatric treatment.

¶ 25    After the live testimony concluded, the parties delivered closing arguments. The State and public guardian both requested the court to enter findings of neglect due to lack of care and injurious environment. Samantha's attorney, in turn, argued that the totality of the evidence demonstrated that Tatiana was not a neglected minor. Ultimately, the court made a finding that Tatiana was neglected due to lack of proper care. The court explained its ruling as follows:

> "[F]irst I do have the responsibility to rule on the credibility of witnesses, and I do find that Ms. Lemke and Investigator Wiekerson were credible witnesses. I also found the maternal grandmother to be credible, and for that matter the mother's sister seemed to be a credible witness as well.

> With regard to [Samantha's] testimony, at times on direct examination it appeared to me that there were some self-serving–there was some self-serving testimony in the way that [she] characterized some things, like the minor missing several days of school when obviously it was far more than several. And then [her] demeanor on cross-examination to some extent appeared to me to be passive/aggressive, and it causes me, in resolving credibility to resolve any substantial differences in the

testimony between [Samantha] and Ms. Lemke and Ms. Wiekerson in favor of Ms. Lemke and Investigator Wiekerson.

With regard to the burden of proof here, which is a preponderance of the evidence, that means it is more probably true than not true, the Court believes it is a close case. But in looking at the totality of the evidence, it appears to meet–the State's met their burden of proof for a finding of neglect care necessary, especially because the records do indicate the minor missed 79 days of school, and the evidence indicates it was primarily because of the mother's physical and mental health issues, which she, I think, truthfully admitted were preventing her child from getting to school.

Now, I appreciate that the minor wasn't failing school, and apparently is very bright, but nevertheless the findings are borne out by the evidence.

Now, with regard to the request for finding of neglect injurious environment, that is a closer question ***. There is no evidence of anything really indicating that Tatiana's ever been abused in any way. It seems to me that although it's a close case, that the evidence doesn't rise to the level for the Court to find that Tatiana's environment was really injurious. And so I won't make that finding.

But there is a finding of neglect care necessary and, I will enter a written adjudication consistent with the Court's finding."

¶ 26    A disposition hearing followed. At the conclusion of the hearing, the court found Samantha to be a fit, willing and able parent but determined it was in Tatiana's best interest to be made a ward of the court. The court, however, declined to place Tatiana in the guardianship of the DCFS administrator and entered an order of protection allowing Tatiana to remain in the physical custody of her mother.[2]

¶ 27    This appeal followed.


¶ 28                              II. ANALYSIS

¶ 29    On appeal, Samantha solely contests the circuit court's adjudication finding that Tatiana was a neglected minor due to lack of proper care. She emphasizes that the evidence demonstrated that her daughter was living in a clean home and that she shared a strong bond with her mother. Although Samantha acknowledges that her daughter missed a significant amount school, she emphasizes that her daughter was receiving passing grades. Moreover, while she declined to participate in DCFS-recommended therapy, Samantha argues that the court overlooked the fact that she sought out assistance on her own and was otherwise cooperative with DCFS investigators. Based upon a review of the totality of the evidence presented during the adjudication hearing, Samantha argues the court's neglect finding is against the manifest weight of the evidence.

¶ 30    The State and public guardian both respond that the court's finding is not against the manifest weight of the evidence. They observe that the record demonstrated that Tatiana

---

[2]Because Samantha does not challenge the court's disposition finding, we will not recount the testimony that the parties presented to the court during the disposition hearing.

missed a "staggering number of days of school" due to Samantha's mental and physical problems. Although Tatiana was able to maintain passing grades despite her numerous absences from school, both parties argue that Samantha's failure to take her daughter to school or make alternative arrangements when she was unable to do so prevented Tatiana from obtaining the necessary education that is required by Illinois law and amounted to "neglect" under the provisions of the Juvenile Court Act.

¶ 31    "The Juvenile Court Act is a statutory scheme, created by the legislature, the purpose of which is to secure for each minor subject thereto the care and guidance which will best serve the minor's safety and moral, emotional, mental and physical welfare, and the best interests of the community." *In re Austin W.*, 214 Ill. 2d 31, 43 (2005); 705 ILCS 405/1-2(1) (West 2010). The best interest of the child is the standard applicable to proceedings under the Juvenile Court Act. *In re Z.L.*, 379 Ill. App. 3d 353 (2008). In a juvenile proceeding, the intent is to determine the status of a minor child on whose behalf proceedings have been brought, not to assign criminal or civil liability to any party. *In re R.B.*, 336 Ill. App. 3d 606, 614 (2003). Specifically, in an adjudicatory hearing, the issue is to determine whether or not a minor is abused, neglected or dependent. *In re Austin W.*, 214 Ill. 2d at 43; 705 ILCS 405/2-21(1) (West 2010). It is the State's burden to prove allegations of neglect, abuse or dependency by the preponderance of the evidence. *In re L.H.*, 384 Ill. App. 3d 836, 841 (2008). A preponderance of the evidence is the amount of evidence that leads the trier of fact to find that a condition is "more probable than not." *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004); *In re N.B.*, 191 Ill. 2d 338, 343 (2000). A trial court's determination, in turn, will not be reversed unless it is against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d at 464; *In re L.H.*, 384 Ill. App. 3d at 841. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re Arthur H.*, 212 Ill. 2d at 464; *In re Christopher S.*, 364 Ill. App. 3d 76, 86 (2006).

¶ 32    The Act seeks to protect neglected and abused minors. 705 ILCS 405/2-3 (West 2010). Pursuant to the Act, a neglected minor includes any child "under 18 years of age who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parent or parents." 705 ILCS 405/2-3(1)(a) (West 2010). The term "neglect" is broad, but has generally been "defined as the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties." *In re L.H.*, 384 Ill. App. 3d at 841; see also *In re Gabriel E.*, 372 Ill. App. 3d 817, 822 (2007); *In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002). Cases involving allegations of neglect and abuse are *sui generis* and must be resolved by evaluating the unique facts and circumstances present in each case. *In re Arthur H.*, 212 Ill. 2d at 463.

¶ 33    Here, we are unable to conclude that the court's finding of neglect predicated on lack of proper care is against the manifest weight of the evidence. The record reflects that Samantha had a lengthy history of substance abuse as well as physical and mental illness. As a result of these issues, Samantha was unable to properly care for her daughter or consistently take Tatiana to school. Moreover, Samantha failed to make alternative arrangements to ensure that

Tatiana's education was not disrupted. As a result, Tatiana missed an exorbitant number of school days and her grades have suffered. Although we acknowledge that Samantha has sought out assistance and counseling for her issues, maintained appropriate housing, and fostered a close bond with her daughter, a finding of neglect under the Act is appropriate where, as here, the minor is "not receiving the proper or necessary support, *education as required by law*, or medical or other remedial care recognized under State law as necessary for a minor's well-being." (Emphasis added.) 705 ILCS 405/2-3(1)(a) (West 2010). Because the court's finding of neglect is supported by the record, we affirm the adjudicatory order.

¶ 34                                    III. CONCLUSION
¶ 35         Accordingly, the judgment of the circuit court is affirmed.

¶ 36         Affirmed.