2024 IL App (1st) 241250-U

FOURTH DIVISION
Order filed: October 31, 2024

No. 1-24-1250

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| In the Matter of D. S.-R., a minor, Respondent-Appellee. | ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | No. 23 JA 541 |
| v. | ) ) | Honorable Shannon P. O'Malley, |
| Takima R., | ) | Judge, presiding. |
| Respondent-Appellant). | ) ) | |

JUSTICE HOFFMAN delivered the judgment of the court. Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Circuit court's finding that minor was abused or neglected under the Juvenile Court Act was not against the manifest weight of the evidence, and circuit court did not err by not finding the minor dependent through no fault of respondent. While minor's out of court statements that she was physically abused were not corroborated, they were not the sole basis for the circuit court's finding.

¶ 2    Respondent Takima R. appeals the circuit court's order finding D. S.-R., respondent's

adopted daughter, abused and neglected under the Juvenile Court Act, 705 ILCS 405/2-3 (West

2024). On appeal respondent argues that the circuit court's finding after an adjudication hearing that D. S.-R. was neglected or abused was against the manifest weight of the evidence and argues that D. S.-R. instead should have been found to be a dependent minor under Section 2-4(1)(c) of the Juvenile Court Act. For the reasons which follow, we affirm.

¶ 3    D. S.-R. was born on June 11, 2010. She was placed with respondent in August of 2017 after being removed from her biological parents, and respondent formally adopted her in August of 2018. On August 9, 2023, the State filed a Petition for Adjudication of Wardship under the Juvenile Court Act, alleging that D. S.-R. was neglected and abused on three bases: (1) neglect based on lack of care, (705 ILCS 405/2-3(1)(a)), (2) neglect due to an injurious environment, (*Id.* § 2-3(1)(b)), and (3) abuse due to substantial risk of injury, (*Id.* § 2-3(2)(ii)). The petition alleged that, on August 3, 2023, D. S.-R. left the home after respondent's wife told her to leave and respondent had threatened to beat her. D. S.-R. ultimately slept on a park bench that night and told DCFS personnel she was afraid to return home. The petition further alleged that, after an assessment on August 5, 2023, indicated that D. S.-R. did not require inpatient psychiatric care, respondent refused to allow D. S.-R. to return home and left without a care plan in place.

¶ 4    On August 9, 2023, the circuit court found that probable cause existed that D. S.-R. was neglected or abused and ordered that temporary custody of D. S.-R. be granted to the Department of Children and Family Services ("DCFS"). The matter proceeded to an adjudication hearing on January 17, 2024. At the adjudication hearing, the State presented the testimony of DCFS Child Protection Investigator Rhonda Collins, and Child Protection Specialists Kimberly McTear and Kimberly McMillan. Respondent testified on her own behalf.

¶ 5    Prior to any testimony, the State moved into evidence three exhibits constituting D. S.-R.'s certified medical records from Hartgrove Hospital ("Hartgrove"), St. Elizabeth Hospital ("St. Elizabeth"), and University of Chicago Comer's Hospital ("Comer's Hospital"). According to the records, D. S.-R. was treated at Hartgrove from April 25, 2023, through May 21, 2023, after a suicide attempt. At Hartgrove, D. S.-R. was diagnosed with "Major depressive disorder, single episode, severe without psychotic features" and was prescribed Lexapro and Risperadone, among other medications. While at Hartgrove, D. S.-R. acted out aggressively towards other patients and repeatedly failed to take responsibility for her actions. The medical records also document statements by respondent that she regretted adopting D. S.-R., was looking into relinquishing her parental rights, and that she was concerned that D. S.-R. was associating with "violent teens" that attacked respondent's family. The records also include statements by respondent that she had found evidence that D. S.-R. had been smoking marijuana and had shared sexual videos of herself with adult men. The records note that respondent refused to attend at least one family session organized by Hartgrove.

¶ 6    The records reflect that D. S.-R. was admitted to Comer's Hospital on May 23, 2023, for suicidal ideation, approximately a day after her release from Hartgrove. She was then transferred to St. Elizabeth on May 24, 2023, staying until June 12, 2023. At St. Elizabeth, D. S.-R. was diagnosed with "Bipolar Disorder, Current Episode, Mixed, without psychotic features." The records include statements by D. S.-R. to staff at St. Elizabeth that she felt unsafe at home and that respondent and her stepmother "whoop[ed]" her. She also reported being molested by a prior foster parent when she was four years old. The St. Elizabeth intake report for "Abuse/Neglect Screening" indicates "none" under the category for physical abuse but does indicate a history of sexual abuse.

St. Elizabeth records also indicate that respondent was "unavailable for staffing and family meetings despite several attempts by staff" and did not answer multiple calls from St. Elizabeth staff while D. S.-R. was at the hospital, prompting St. Elizabeth staff to contact DCFS.

¶ 7 The records show that D. S.-R. was again hospitalized at Comer's Hospital from August 4 to August 6, 2023, due to suicidal ideation. The records state that respondent told Comer's Hospital staff that D. S.-R. was not able to come back to her home. The records document efforts by social workers at the hospital to contact DCFS to secure alternative placement for D. S.-R. According to the records, D. S.-R. told hospital staff that she did not want to return home with respondent and that she wanted to live in a group home. D. S.-R. also told hospital staff that she did not want to ride with respondent to the police station once she was discharged.

¶ 8 After D. S.-R.'s medical records were admitted, Rhonda Collins testified first for the State. Collins testified that she was assigned to a DCFS investigation regarding D. S.-R. on August 5, 2023. On that date, Collins went to the Comer's Hospital emergency room to meet with D. S.-R. and respondent. When Collins arrived, respondent was attempting to arrange for D. S.-R. to stay at a shelter called Comprehensive Community-Based Youth Services ("CCBYS"). According to Collins, respondent was arranging for D. S.-R. to go to CCBYS because respondent was unwilling to allow D. S.-R. to return home from the hospital.

¶ 9 Collins followed D. S.-R., respondent, and respondent's wife to the police station to complete paperwork that would allow D. S.-R. to go to the CCBYS shelter. Once the paperwork was completed, both respondent and her wife told Collins that they were tired and wanted to leave the police station. Collins spoke with officers at the police station, who stated there was no safe place in the station for D. S.-R. to stay. Collins then spoke to an employee at CCBYS who told her

that they could not take D. S.-R. at the shelter as she was too young. Collins spoke with respondent about possible alternative placements and respondent mentioned placing D. S.-R. with her siblings, but said that their caregiver was not willing to take D. S.-R. At that point, Collins took D. S.-R. into DCFS custody because respondent refused to allow D. S.-R. to return home.

¶ 10 On cross examination, Collins acknowledged that D. S.-R. was discharged from the Comer's Hospital emergency room to respondent, but D. S.-R. refused to get in respondent's vehicle and instead rode with respondent's wife to the police station. Collins observed that respondent seemed "at her wits end" and "was tired of the situation and was not trying to make a care plan." Collins admitted that the respondent was still present at the police station when she took D. S.-R. into DCFS custody.

¶ 11 Kimberly McTear testified that she spoke over the phone with respondent on August 7, 2023, regarding D. S.-R. During that conversation respondent told McTear "that she was done with [D. S.-R.], that she did all she could do for her and that she needs to be placed with someone else." Respondent also said she would look for D. S.-R.'s biological family members on Facebook. McTear observed respondent to be angry over the situation and sensed that respondent did not want to have D. S.-R. back in her care.

¶ 12 McTear also spoke with D. S.-R. in person on August 7, 2023. D. S.-R. stated that her stepmother was mean to her and would try to start fights. She explained to McTear that, on August 3, 2023, she got into a fight with her stepmother, who told her to leave the home. Her stepmother then told her to go to Jackson Park. D. S.-R. then went to the park and slept on a park bench that night. D. S.-R. told McTear that respondent was on the phone during the argument with her

stepmother and that respondent agreed with her stepmother. D. S.-R. stated to McTear that she did not want to go home to respondent, as she thought she would be beaten if she went back.

¶ 13    Kimberly McMillan testified that she was assigned to investigate D. S.-R.'s case on August 4, 2023. McMillan met with D. S.-R. on that date in the evening at a YMCA close to respondent's home. D. S.-R. told McMillan that she had a disagreement with her stepmother over cleaning her room or taking care of the dog. D. S.-R. said that respondent was on the phone during the fight. D. S.-R. told McMillan that her stepmother had hit her, though she did not specify where. She told McMillan that after the fight, her stepmother left the house. Since D. S.-R. was not allowed to be in the house by herself, she left the house and went to the park. She also told McMillan that she did not want to return to respondent's home. While McMillan spoke with D. S.-R., she began expressing suicidal thoughts, so McMillan reached out to respondent and law enforcement that were present at the YMCA. Respondent contacted an ambulance to take D. S.-R. to the Comer's Hospital. McMillan further testified that D. S.-R. reported her stepmother calling her "fat and lazy". D. S.-R. also told McMillan that she had been diagnosed with bi-polar disorder but had not taken medication for a while.

¶ 14    On cross examination by respondent's counsel, McMillan acknowledged that D. S.-R. said she had never been put out of the home. McMillan also spoke with respondent. Respondent told McMillan that, once she realized D. S.-R. was not home, she went looking for her and filed a missing person's report. At the conclusion of McMillan's testimony, the State and Guardian *ad litem* rested.

¶ 15    Respondent testified that D. S.-R. had run away on August 3, 2023. She stated that, on August 3rd, she left work early because she "knew that there was a situation going on at home".

When she arrived at home and D. S.-R. was not present, she picked up her wife and went looking for D. S.-R. Respondent and her wife drove through the neighborhood, Washington Park, Indiana Park, and near D. S.-R.'s school to look for D. S.-R. After respondent was unable to locate D. S.-R., she contacted the police and completed a missing person's report.

¶ 16    According to respondent, she was called to the YMCA by a DCFS worker on August 4, 2023. When she arrived at the YMCA, she spoke with a DCFS worker and explained what had happened the previous day. She testified that she was in contact with D. S.-R.'s post-adoption worker at DCFS regarding D. S.-R.'s behavioral issues. She first started noticing behavioral problems when D. S.-R. was placed with her in 2017. She stated that she attempted to get D. S.-R. involved in programs and classes, but D. S.-R.'s behavior did not improve. Respondent reached out to D. S.-R.'s post-adoption worker two times, but the post-adoption worker did not provide any resources. Respondent also reached out to multiple agencies regarding therapy and possible residential placement for D. S.-R., but D. S.-R. was placed on the waitlist.

¶ 17    Respondent stated that D. S.-R. was hospitalized twice between April and June of 2023 for a suicide attempt and for suicidal ideation. In June, D. S.-R. returned home from St. Elizabeth after being diagnosed with bi-polar disorder for which she was prescribed medication.

¶ 18    Respondent testified that, on August 5, 2023, she took D. S.-R. to the police station "for a handoff to CCBYS", though she acknowledged that D. S.-R. ultimately was not placed at that shelter. At the police station, she spoke with Collins regarding residential treatment for D. S.-R. or other placement options, and she told Collins she would try to reach out to the caregiver of D. S.-R.'s siblings.

¶ 19   On cross examination, the respondent admitted she told Collins that she was going to leave the police station to check on her wife but said that she would come back. She acknowledged that she was told by staff at Hartgrove that D. S.-R. may not qualify for a residential treatment facility. She also acknowledged that she was taking legal steps to relinquish her parental rights to D. S.-R. She admitted that staff at Comer's Hospital told her they would send D. S.-R. home on August 4, 2023. After her testimony, respondent rested.

¶ 20   During closing arguments, respondent argued that the State had not met its burden to show neglect or abuse and that D. S.-R. should be found a dependent minor due to her behavioral problems both in school and while being treated at Hartgrove and St. Elizabeth. The respondent also argued that D. S.-R.'s out of court statements alone could not support a finding of abuse and that no other evidence supported a finding that D. S.-R. was hit by her stepmother or was abused.

¶ 21 Following the parties' arguments, the circuit court found by a preponderance of the evidence that D. S.-R. was neglected and abused on all three bases raised in the State's petition. In its oral ruling, the court largely focused on the fact that respondent maintained that she did not want D. S.-R. to come home. In concluding, the circuit court stated "[s]o based on the preponderance of the evidence - - and you don't beat your child, the child is afraid of going home. It's not right. And based upon the records, the child probably would have been subject to physical injury."

¶ 22   The matter proceeded to a disposition hearing on May 20, 2024. On request by the State, the circuit court took judicial notice of the findings at the adjudication hearing. The State also entered three exhibits without objection, an assessment of respondent, a DCFS placement report from March of 2024, and a service plan from February of 2024. The State presented the testimony

of DCFS caseworker Porcia Collins (hereinafter referred to as "Porcia" to distinguish from Rhonda Collins). Porcia testified that D. S.-R. had been placed in a foster home with her biological siblings. D. S.-R. had been in school and that there were no unusual incidents involving D. S.-R. since the adjudication hearing. Porcia stated that DCFS encouraged D. S.-R. to engage in individual therapy. Porcia met with respondent and recommended individual therapy and parenting classes, as well as family therapy. She testified that D. S.-R. and respondent had spoken recently and that they had gotten along well. Porcia recommended that D. S.-R. become a ward of the court to allow more time for respondent to participate in recommended services, with a goal of returning D. S.-R. home within 12 months.

¶ 23    During closing arguments, all parties requested that the court find that respondent was unable to care for D. S.-R., with a goal of returning home within 12 months. The circuit court found that respondent was unable to care for D. S.-R. but noted that respondent was willing to engage in services. The circuit court adjudicated D. S.-R. a ward of the court with a permanency goal of returning D. S.-R. home within 12 months.

¶ 24    On appeal, respondent argues (1) the circuit court erred in finding that D. S.-R. was abused at the adjudication hearing solely based on her unconfronted and uncorroborated out of court statements, (2) the circuit court's finding of neglect and abuse at the adjudication hearing was against the manifest weight of the evidence, and (3) the circuit court erred by not finding a "no fault" dependency under section 2-4(1)(c) of the Juvenile Court Act. Respondent does not appeal the circuit court's finding after the disposition hearing where D. S.-R. was adjudicated a ward of the court. Although we agree with respondent that there was no corroboration for D. S.-R.'s out of

court statements that she was physically abused, those statements were not the sole basis for the circuit court's ultimate finding of abuse and neglect.

¶ 25   The Juvenile Court Act sets forth the procedure and bases upon which a court may find a minor abused, neglected, or dependent and order the minor a ward of the court. 705 ILCS 405/2 (West 2024). After a petition is filed by the State, the matter proceeds to an adjudicatory hearing, where "the court shall first consider only the question whether the minor is abused, neglected, or dependent." *Id.* § 2-18(1). If the court finds the minor abused, neglected, or dependent, the matter proceeds to a dispositional hearing, where the court determines "whether it is consistent with the health, safety and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.* § 2-21(2).

¶ 26   Relevant to this appeal, the bases upon which to conclude a minor is abused or neglected include (1) the neglect of a minor "who is not receiving the proper or necessary support . . . including adequate food, clothing, and shelter, or who is abandoned by the minor's parent" (*Id.* § 2-3(1)(a)), (2) a situation "whose environment is injurious to the minor's welfare" (*Id.* § 2-3(1)(b)), and (3) abuse where a household member "creates a substantial risk of physical injury" (*Id.* § 2-3(2)(ii)). The Act also allows for a minor to be adjudicated "dependent" when they are "without proper medical or other remedial care recognized under State law or other care necessary for his or her wellbeing through no fault, neglect or lack of concern by his parents, custodian, or guardian." *Id.* § 2-4(c)(1). The State must prove the allegations of neglect or abuse at the adjudication hearing by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 27   On appeal, the circuit court's finding that a minor has been abused or neglected is given deference and will not be disturbed absent a showing that the finding was against the manifest

weight of the evidence. *In re J.S.* 2012 IL App (1st) 120615, ¶ 31. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly evident from the record. *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). "Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 14 (2005).

¶ 28 Respondent's first argument is that the circuit court erred by finding that D. S.-R. was abused based on D. S.-R.'s unconfronted out of court statements when they lacked corroboration. The Juvenile Court Act allows for the admission of a minor's out of court statements to support a finding of abuse or neglect, but provides that "no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect". 705 ILCS 405/2-18(c)(4) (West 2024). Corroborating evidence "requires there to be independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." *In re A.P.*, 179 Ill. 2d 184, 199 (1997).

¶ 29 Respondent's argument focuses on a lack of corroborating evidence for D. S.-R.'s out of court statements that she was subjected to and feared physical abuse, which the circuit court relied upon in part in its oral ruling during the adjudication hearing. As pointed out by the State, it is unclear which specific statements respondent is referencing, as the medical records and the testimony from DCFS staff contained numerous hearsay statements by D. S.-R. implicating possible physical abuse. Regardless of the specific statements being referenced, we agree with respondent that the record lacks independent corroboration of any physical abuse of D. S.-R. beyond her own out of court statements. There was no testimony of any observed injuries that

would suggest physical abuse, nor any indication in the medical records that D. S.-R. showed signs of physical abuse.

¶ 30    However, D. S.-R.'s out of court statements suggesting she was physically abused were not the sole basis for the circuit court's finding of abuse or neglect. The circuit court's ultimate finding was corroborated by independent evidence and was not against the manifest weight of the evidence, as the evidence supported the circuit court's finding that D. S.-R. was neglected due to a lack of care. The evidence showed that D. S.-R. left home after an argument with respondent's wife and spent the night away from the home sleeping on a park bench. She was then taken to the hospital for expressing suicidal thoughts, and respondent refused to allow her back into the home even after she was not approved for inpatient treatment or a shelter. Respondent's refusal to allow D. S.-R. back home and her failure to create an alternative care plan supported the circuit court's finding that D. S.-R. was neglected due to lack of care.

¶ 31    Respondent argues that D. S.-R. should have been found dependent through no fault of her own, citing *In re Christopher S.*, 364 Ill. App. 3d 76 (2006). In *Christopher S.*, the minor had multiple violent outbursts, and the respondents testified about their efforts to seek treatment for the minor, including reaching out to 43 different possible residential treatment facilities. The respondents ultimately did not want the minor back at home for their own safety. *Id.* at 87. The circuit court found that the minor was dependent through no fault of the respondents, and this court affirmed. *Id.*

¶ 32    The present case is distinguishable factually and procedurally from *Christopher S.*, which involved the minor's appeal of the dependency finding arguing that the court should have instead found the minor neglected. *Id.* at 88. In the present case, while there was evidence that D. S.-R.

had behavioral problems, there was little evidence that her behavior posed the danger towards respondent's family that prompted the dependency finding in *Christopher S.* Additionally, although respondent made some efforts to secure placement for D. S.-R., D. S.-R. was ultimately found ineligible. Respondent still refused to take D. S.-R. home and had no other alternative care plan in place. D. S.-R. was left at a police station where there was no facility for her to stay and there was no other care plan in place. *See In re Christina M.*, 333 Ill. App. 3d 1030, 1035 (2002) (evidence supports neglect finding over dependency finding when respondent was responsible for placing minor in current position by refusing to allow minor to return home). Respondent's reliance on *In re S.W.* is similarly distinguishable, as that case also involved the mother's appeal of a dependency finding. *In re S.W.*, 342 Ill. App. 3d 445, 449-51 (2003).

¶ 33   Subsequent cases decided after *Christopher S.* are more analogous the present case. For example, in *In re Diamond M.*, 2011 IL App (1st) 111184, the minor was hospitalized multiple times due to mental health problems, had been physically aggressive towards peers, and indicated a desire to hurt the respondent during clinical interviews. Upon being discharged from the hospital, the minor indicated she did not want to go home to the respondent, and the respondent did not allow the minor to return home or arrange for alternative care. *Id.* ¶ 13. This court affirmed the circuit court's neglect finding and distinguished *Christopher S.*, noting that the respondent did not make the same efforts to find residential treatment for the minor and that the respondent showed a lack of concern for the minor's treatment. *Id.* ¶¶ 27-28, 32.

¶ 34   In *J.S.*, 2012 IL App (1st) 120615, the minor had been "locked out" by the respondent who would not allow the minor to come home, claiming that he needed help. The minor had threatened the mother with a knife and had been expelled from school for fighting. *Id.* ¶¶ 16-17. After

numerous efforts by DCFS to facilitate the minor coming home or placing the minor with another family member with minimal help by the respondent, DCFS took custody of the minor. *Id.* ¶¶ 7-11 The circuit court found the minor neglected and rejected the respondent's argument for a finding of no-fault dependency. *Id.* ¶ 26. This court affirmed, finding *Christopher S.* distinguishable as the respondent failed to cooperate with DCFS in finding shelter and failed to create any sort of care plan for the minor. *Id.* ¶¶ 34-36.

¶ 35     The present case is closer to the facts of *Diamond M.* and *J.S.* than it is to *Christopher S.* The evidence presented at the adjudication hearing showed that D. S.-R. had behavioral and mental health problems but did not suggest that she presented any danger to respondent. D. S.-R.'s behavior posed even less of a risk to respondent than the minor in *J.S.*, where the minor was not found dependent despite threatening a parent with a knife. Additionally, while respondent made efforts to place D. S.-R. in a shelter, those efforts pale in comparison to the efforts made by the parents in *Christopher S.* When those efforts proved unsuccessful, respondent still maintained that D. S.-R. could not come home. Respondent's refusal to allow D. S.-R. to come home and her failure to find alternative placement supported the circuit court's finding of neglect for lack of care.

¶ 36 Respondent argues that her presence at the police station undercuts any notion that she "locked out" D. S.-R., but both Collins' testimony and the medical records from Comer's Hospital both refer to the fact that respondent was not going to allow D. S.-R. to come home. Collins testified that respondent had little interest in working on an alternative care plan for D. S.-R. after the CCBYS placement was unsuccessful. Respondent also argues that D. S.-R.'s statements suggest that she was at risk of harming herself at respondent's home, and therefore, it is incorrect

to assume that respondent's home was the only safe location. However, the fact that D. S.-R. harmed herself at home and that she did not want to return home does not mean she should be refused the opportunity to return home. Respondent was told by medical professionals at Comer's Hospital that D. S.-R. was not a suitable candidate for inpatient treatment, and D. S.-R. was not eligible for placement at the CCBYS shelter. At the time D. S.-R. was taken into DCFS custody, respondent did not have a placement plan in place besides attempting to contact individuals who may or may not have been willing to take D. S.-R. On those facts, we cannot say that the circuit court's finding of neglect due to lack of care was against the manifest weight of the evidence.

¶ 37   Although respondent argues that the evidence supported a no-fault dependency finding based on her efforts to obtain help for D. S.-R. and the evidence of D. S.-R.'s behavioral problems, the circuit court's finding of neglect based on lack of necessary care is not against the manifest weight of the evidence when respondent was unwilling to allow her back into the home and made only marginal and ultimately unsuccessful efforts to arrange for an alternative care plan. For that reason, we affirm the judgment of the circuit court.

¶ 38   Affirmed.